UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

DISABILITY RIGHTS NEW YORK,

                            Plaintiff,

v.                                                            1:21-CV-0739
                                                              (GTS/CFH)
NEW YORK STATE DEPARTMENT OF
CORRECTIONS AND COMMUNITY
SUPERVISION; and ANTHONY J. ANNUCCI,

                            Defendants.
_____

APPEARANCES:                                   OF COUNSEL:

DISABILITY RIGHTS NEW YORK             BRANDY L.L. TOMLINSON, ESQ.
  Counsel for Plaintiff                         ALYSSA GALEA, ESQ.
44 Exchange Boulevard, Suite 110              CHRISTINA ASBEE, ESQ.
Rochester, NY 14614

HON. LETITIA A. JAMES                          HELENA O. PEDERSON, ESQ.
Attorney General for the State of New York     Assistant Attorney General
  Counsel for Defendants
The Capitol
Albany, NY 12224

GLENN T. SUDDABY, Chief United States District Judge

## DECISION and ORDER

        Currently before the Court, in this civil rights action filed by Disability Rights New York

("Plaintiff") against the New York State Department of Corrections and Community Supervision

("DOCCS") and Acting Commissioner of DOCCS Anthony J. Annucci (collectively, the

"Defendants"), is Plaintiff's motion for a preliminary injunction requiring Defendants to provide

access to copies of certain documents requested pursuant to Plaintiff's authority as the

designated Protection and Advocacy ("P&A") system for New York.  (Dkt. No. 6.)  For the reasons set forth below, Plaintiff's motion is granted.

## I.     RELEVANT BACKGROUND

### A.     Plaintiff's Complaint

Generally, in its Complaint, Plaintiff's asserts three claims: (1) a claim that Defendants' failure to provide Plaintiff with requested records violates the Developmental Disabilities Assistance and Bill of Rights Act of 2000 (the "DD Act"), 42 U.S.C. § 15041 *et seq.*, and its implementing regulation, 45 C.F.R. § 1326.25 ("DD Access Regulation"); (2) a claim that Defendants' refusal to provide records as designated by law violates the Protection and Advocacy for Assistive Technology Act of 2004 (the "PAAT Act"), 29 U.S.C. § 3002 *et seq.*, and its implementing regulations; and (3) a claim that Defendants' refusal to promptly provide the requested records violates the Protection and Advocacy for Individuals with Mental Illness Act of 1986 (the "PAIMI Act"), 42 U.S.C. § 10801 *et seq.*, and its implementing regulation, 42 C.F.R. § 51.41 ("PAIMI Access Regulation") (collectively, the "P&A Acts").  (Dkt. No. 1 [Pl.'s Compl.].)

Generally, Plaintiff's claims arise from Defendants' refusal to provide Plaintiff with the records that it had requested, pursuant to its authority as the P&A system for New York, for Incarcerated Individual A on January 4, 2021, Incarcerated Individual B on January 7, 2021, and Incarcerated Individual C on January 11, 2021.[1]

More specifically, Plaintiff's Complaint alleges as follows.  (Dkt. No. 1 [Pl.'s Compl.].) As to Incarcerated Individual A, with Incarcerated Individual A's authorization, Plaintiff's

---

[1]     The Court notes that, pursuant to its Text Order on June 29, 2021, Plaintiff's Complaint and motion for preliminary injunction uses pseudonyms to preserve the privacy of incarcerated individuals whose records are at issue in this case.  (Dkt. No. 8.)

representative submitted a written records request to Defendants seeking copies of relevant records; but Defendants stated that those records would not be available for physical inspection, nor would they be copied and produced.  (*Id.* at 7-8.)  As to Incarcerated Individual B, with Incarcerated Individual B's authorization, Plaintiff's representative submitted a written records request to Defendants seeking copies of relevant records; but Defendants again stated that those records would not be available for physical inspection, nor would they be copied and produced. (*Id.* at 8-10.)  Finally, as to Incarcerated Individual C, with Incarcerated Individual C's authorization, Plaintiff's representative submitted a written records request to Defendants seeking copies of relevant records; but Defendants again stated that those records would not be available for physical inspection, nor would they be copied and produced.  (*Id.* at 10-11.)  As of the date of this Decision and Order, Plaintiff has not received any of the requested records pertaining to Incarcerated Individual A, Incarcerated Individual B, or Incarcerated Individual C. (*Id.*)

### B.   Relevant Procedural History

This case is the latest battle of an ongoing struggle between Plaintiff and Defendant about the provision of records related to individuals with mental or developmental disabilities incarcerated in DOCCS facilities.  *See Disability Rights New York v. New York State Dep't of Corrs. and Cmty. Supervision*, 18-CV-0980 (GTS/CFH) ("*DRNY I*"); *Disability Rights New York v. New York State Dep't of Corrs. and Cmty. Supervision*, 20-CV-1487 (GTS/CFH) ("*DRNY II*"). For the sake of brevity, the Court will assume the reader's familiarity with the parties' first two battles.

On June 28, 2021, Plaintiff filed its Complaint in this action.  (Dkt. No. 1 [Pl.'s Compl.].) On June 28, 2021, Plaintiff filed the current motion for preliminary injunction, seeking an order

restraining Defendants from denying Plaintiff access to the requested records made pursuant to the relevant P&A Acts.  (Dkt. No. 6.)  On September 10, 2021, Defendants filed their opposition.  (Dkt. No. 17 [Defs.' Opp'n Mem. of Law].)  Finally, on October 6, 2021, Plaintiff filed its reply.  (Dkt. No. 21 [Pl.'s Reply Mem. of Law].)  The Court dispensed with a hearing because Defendants never requested one, and because in any event it was not necessary.[2]

### C.   Briefing on Plaintiff's Motion

#### 1.   Plaintiff's Memorandum of Law

Generally, in support of its motion for a preliminary injunction, Plaintiff asserts two main arguments.  First, Plaintiff argues that, given its designation as the P&A system in New York State, it is entitled to access records maintained and held by Defendants.  (Dkt. No. 6, Attach. 2, at 7-10 [Pl.'s Mem. of Law].)  More specifically, Plaintiff argues that its request for records meets the statutory criteria for records access and Defendants have no legal justification for refusing to provide copies of the records requested by Plaintiff.  (*Id.* at 8-10.)  Second, Plaintiff argues that its federal mandate to protect people with disabilities in New York State meets the requirements for a preliminary injunction because (a) it is likely to succeed on the merits of its claims, (b) it will suffer irreparable harm absent the Court's intervention, (c) the balance of hardships weighs in favor of granting the injunction, and (d) the public interest will be advanced by the provision of preliminary relief.  (*Id.* at 10-13.)

---

[2]     As the Court has previously observed, "[w]hile a hearing is generally required on motion for preliminary injunction, it is not required in all cases, such as cases in which the affidavits submitted by the parties provide an adequate basis for the court's decision (and the most significant factors on which the injunction was based would have remained essentially unchanged by any additional evidence at a hearing)."  *Hafez v. City of Schenectady*, 17-CV-0219, 2017 WL 6387692, at *5 (N.D.N.Y. Sept. 11, 2017) (Suddaby, C.J.) (collecting cases).  Here, the Court finds that no hearing is required because the affidavits and exhibits submitted by the parties provide an adequate basis for the Court's decision.

### 2.       Defendants' Opposition Memorandum of Law

Generally, in their opposition to Plaintiff's motion, Defendants argue that the Court should deny Plaintiff's motion for a preliminary injunction for two reasons: (1) Plaintiff failed to establish by a clear or substantial likelihood of success on the merits of its claims because it (a) failed to identify the records it had requested, and (b) requested to obtain copies of the records before it had physically inspected them; and (2) Plaintiff failed to establish that it would be irreparably harmed by Defendant DOCCS' failure to provide it with copies of the requested records. (Dkt. No. 17, at 4-14 [Defs.' Opp'n Mem. of Law].)

### 3.       Plaintiff's Reply Memorandum of Law

Generally, in its reply to Defendants' opposition, Plaintiff asserts four arguments. (Dkt. No. 21 [Pl.'s Reply Mem. of Law].) First, Plaintiff argues that the Court should grant its motion for a preliminary injunction because the plain language of the P&A Acts prohibit a service provider from denying the P&A system access to records. (*Id.* at 3-5.) More specifically, Plaintiff argues that Defendants incorrectly (a) interpreted the P&A Acts to require Plaintiff to visit Defendants' facilities to view the records it seeks prior to obtaining copies of them, and (b) asserted that the timeframe for producing copies of records begins only after they retrieve the records for copying. (*Id.* at 4-5.) Second, Plaintiff argues that the DD Access Regulation and PAIMI Access Regulation clearly afford Plaintiff access to copies of records upon a written request, and copies of such records must be made available within the timeframes set forth by the respective access regulation. (*Id.* at 5.) More specifically, Plaintiff argues that Defendants incorrectly rely on the Court's prior rulings to assert that the rulings control the timeframe for responding to requests for records production. (*Id.* at 6.) Third, Plaintiff argues that the U.S. Department of Health and Human Services' ("HHS") interpretation of the P&A Acts and access

regulations are entitled to a degree of deference.[3]  (*Id.* at 7-8.)  Fourth, Plaintiff argues that it

would suffer irreparable harm from Defendants' denial of access to the relevant records because

a P&A system suffers irreparable harm when it is unable to access records that it has requested,

resulting in it failing to further its statutory mandates.  (*Id.* at 8-10.)

## II.   GOVERNING LEGAL STANDARDS

### A.   Legal Standard Governing Motions for Preliminary Injunction

"'The purpose of a preliminary injunction is . . . to preserve the relative positions of the

parties.'"  *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 37-38 (2d Cir.

2018) (quoting *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 [1981]).  "A preliminary

injunction is an 'extraordinary and drastic remedy' . . . . ; it is never awarded as of right . . . ."

*Munaf v. Green*, 553 U.S. 674, 689-90 (2008) (internal citations omitted).  Generally, in the

Second Circuit, a party seeking a preliminary injunction must establish the following three

elements: (1) that there is either (a) a likelihood of success on the merits and a balance of equities

tipping in the party's favor or (b) a sufficiently serious question as to the merits of the case to

make it a fair ground for litigation and a balance of hardships tipping decidedly in the party's

favor; (2) that the party will likely experience irreparable harm if the preliminary injunction is

not issued; and (3) that the public interest would not be disserved by the relief.  *See Winter v.*

*Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (reciting standard limited to the first part of

the above-stated elements and using word "equities" instead of the word "hardships" and

deleting the word "decidedly"); *accord, Glossip v. Gross*, 135 S. Ct. 2726, 2736-37 (2015); *see*

*also Am. Civil Liberties Union v. Clapper*, 785 F.3d 787, 825 (2d Cir. 2015) (reciting standard

---

[3]      The Court notes that HHS promulgated regulations governing activities carried out by
P&A agencies, including access to records.

including the second part of second above-stated element and using words "hardships" and "decidedly"); *Citigroup Glob. Mkts., Inc v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 38 (2d Cir. 2010) (holding that "our venerable standard for assessing a movant's probability of success on the merits remain valid [after the Supreme Court's decision in *Winter*]").

With regard to the first part of the first element, a "likelihood of success" requires a demonstration of a "better than fifty percent" probability of success. *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir. 1985), *disapproved on other grounds*, *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349, n.2 (1987). "A balance of equities tipping in favor of the party requesting a preliminary injunction" means a balance of the hardships against the benefits. *See, e.g.*, *Ligon v. City of New York*, 925 F. Supp.2d 478, 539 (S.D.N.Y. 2013) (characterizing the balancing "hardship imposed on one party" and "benefit to the other" as a "balance[ing] [of] the equities"); *Jones v. Nat'l Conf. of Bar Exam'rs*, 801 F. Supp.2d 270, 291 (D. Vt. 2011) (considering the harm to plaintiff and any "countervailing benefit" to plaintiff in balancing the equities); *Smithkline Beecham Consumer Healthcare, L.P. v. Waston Pharm., Inc.*, 99-CV-9214, 1999 WL 34981557, at *4-5 (S.D.N.Y. Sept. 13, 1999) (considering the harm to defendant and the "benefit" to consumers in balancing the equities); *Arthur v. Assoc. Musicians of Greater New York*, 278 F. Supp. 400, 404 (S.D.N.Y. 1968) (characterizing "balancing the equities" as "requiring plaintiffs to show that the benefit to them if an injunction issues will outweigh the harm to other parties"); *Rosenstiel v. Rosenstiel*, 278 F. Supp. 794, 801-02 (S.D.N.Y. 1967) (explaining that, in order to "balance the equities," the court "will consider the hardship to the

plaintiff . . . , the benefit to [the] plaintiff . . . , and the relative hardship to which a defendant will be subjected") (internal quotation marks omitted).[4]

With regard to the second part of the first element, "[a] sufficiently serious question as to the merits of the case to make it a fair ground for litigation" means a question that is so "substantial, difficult and doubtful" as to require "a more deliberate investigation." *Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 740 (2d Cir. 1953); *accord*, *Semmes Motor, Inc. v. Ford Motor Co.*, 429 F.2d 1197, 1205-06 (2d Cir. 1970).[5]  "A balance of hardships tipping decidedly toward the party requesting a preliminary injunction" means that, as compared to the hardship suffered by the other party if the preliminary injunction is granted, the hardship suffered by the moving party if the preliminary injunction is denied will be so much greater that it may be characterized as a "real hardship," such as being "driven out of business . . . before a trial could be held." *Buffalo Courier-Express, Inc. v. Buffalo Evening News, Inc.*, 601 F.2d 48, 58 (2d Cir. 1979); *Int'l Bus. Mach. v. Johnson*, 629 F. Supp.2d 321, 333-34 (S.D.N.Y. 2009); *see also Semmes Motors, Inc.*, 429 F.2d at 1205 (concluding that the balance of hardships tipped decidedly in favor of the movant where it had demonstrated that, without an injunctive order, it would have been forced out of business as a Ford distributor).[6]

---

[4]     *See also Abbott Labs v. Mead Johnson & Co.*, 971 F.2d 6, 12, n.2 (7th Cir. 1992) ("Weighing the equities as a whole favors X, making preliminary relief appropriate, even though the *undiscounted* balance of harms favors Y.") (emphasis added).

[5]     *See also Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 402 (6th Cir. 1997); *Rep. of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988); *City of Chanute v. Kansas Gas and Elec. Co.*, 754 F.2d 310, 314 (10th Cir. 1985); *R.R. Yardmasters of Am. v. Penn. R.R. Co.*, 224 F.2d 226, 229 (3d Cir. 1955).

[6]     The Court notes that, under the Second Circuit's formulation of this standard, the requirement of a balance of *hardships* tipping *decidedly* in the movant's favor is added only to the second part of the first element (i.e., the existence of a sufficiently serious question as to the merits of the case to make a fair ground for litigation), and not also to the first part of the first element (i.e., the existence of a likelihood of success on the merits), which (again) requires

With regard to the second element, "irreparable harm" is "certain and imminent harm for which a monetary award does not adequately compensate." *Wisdom Import Sales Co. v. Labatt Brewing Co.*, 339 F.3d 101, 113 (2d Cir. 2003). Irreparable harm exists "where, but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied." *Brenntag Int'l Chem., Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999).

With regard to the third element, the "public interest" is defined as "[t]he general welfare of the public that warrants recognition and protection," and/or "[s]omething in which the public as a whole has a stake[,] esp[ecially], an interest that justifies governmental regulation." Public Interest, *Black's Law Dictionary* (9th ed. 2009).

The Second Circuit recognizes three limited exceptions to the above-stated general standard. *Citigroup Glob. Mkts., Inc.*, 598 F.3d at 35, n.4.

First, where the moving party seeks to stay government action taken in the public interest pursuant to a statutory or regulatory scheme, the district court should not apply the less rigorous "serious questions" standard but should grant the injunction only if the moving party establishes, along with irreparable injury, a likelihood that he will succeed on the merits of his claim. *Id.* (citing *Able v. United States*, 44 F.3d 128, 131 [2d Cir. 1995]); *see also Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs.*, 769 F.3d 105, 110 (2d Cir. 2014) ("A plaintiff

---

merely a balance of *equities* (i.e., hardships and benefits) tipping in the movant's favor. *See Citigroup Glob. Mkts., Inc.*, 598 F.3d at 36 ("Because the moving party must not only show that there are 'serious questions' going to the merits, but must additionally establish that 'the balance of hardships tips decidedly' in its favor . . . , its overall burden is no lighter than the one it bears under the 'likelihood of success' standard.") (internal citations omitted); *cf. Golden Krust Patties, Inc. v. Bullock*, 957 F. Supp.2d 186, 192 (E.D.N.Y. 2013) ("[T]he *Winter* standard . . . requires the balance of equities to tip in the movant's favor, though not necessarily 'decidedly' so, even where the movant is found likely to succeed on the merits.").

cannot rely on the 'fair-ground-for-litigation' alternative to challenge governmental action taken in the public interest pursuant to a statutory or regulatory scheme.") (internal quotation marks omitted).  This is because "governmental policies implemented through legislation or regulations developed through presumptively reasoned democratic processes are entitled to a higher degree of deference and should not be enjoined lightly."  *Able*, 44 F.3d at 131.

Second, a heightened standard—requiring both a "clear or substantial" likelihood of success and a "strong" showing of irreparable harm"—is required when the requested injunction (1) would provide the movant with all the relief that is sought and (2) could not be undone by a judgment favorable to non-movant on the merits at trial.  *Citigroup Glob. Mkts., Inc.*, 598 F.3d at 35, n.4 (citing *Mastrovincenzo v. City of New York*, 435 F.3d 78, 90 [2d Cir. 2006]); *New York v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015) ("When either condition is met, the movant must show [both] a 'clear' or 'substantial' likelihood of success on the merits . . . *and* make a 'strong' showing' of irreparable harm' . . . .") (emphasis added).

Third, the above-described heightened standard may also be required when the preliminary injunction is "mandatory" in that it would "alter the status quo by commanding some positive act," as opposed to being "prohibitory" by seeking only to maintain the *status quo*. *Citigroup Glob. Mkts., Inc.*, 598 F.3d at 35, n.4 (citing *Tom Doherty Assocs. v. Saban Entm't*, 60 F.3d 27, 34 [2d Cir. 1995]).[7]

Because the parties have demonstrated in their memoranda of law an adequate understanding of this legal standard, the Court need not, and does not, further elaborate on this

---

[7]     Alternatively, in such a circumstance, the "clear or substantial likelihood of success" requirement may be dispensed with if the movant shows that "extreme or very serious damage will result from a denial of preliminary relief."  *Citigroup Glob. Mkts., Inc.*, 598 F.3d at 35, n.4 (citing *Tom Doherty Assocs. v. Saban Entm't*, 60 F.3d 27, 34 [2d Cir. 1995]).

legal standard in this Decision and Order, which (again) is intended primarily for the review of the parties.

**B.      Legal Standard Governing Access to Records by a P&A System**

Under the DD Act, a P&A system has the authority to, among other things, "investigate incidents of abuse and neglect of individuals with developmental disabilities if the incidents are reported to the system or if there is probable cause to believe the incidents occurred," and "have access to all records of (i) any individual with a developmental disability who is a client of the system if such individual, or the legal guardian, conservator, or other legal representative of such individual, has authorized the system to have such access," and "(ii) any individual with a developmental disability, in a situation in which . . . a complaint has been received by the system about the individual with regard to the status or treatment of the individual or, as a result of monitoring or other activities, there is probable cause to believe that such individual has been subject to abuse or neglect." 42 U.S.C. § 15043(a)(2).[8] The P&A system is permitted "access" to the records of such individuals (and any other records that are relevant to conducting an investigation), "not later than 3 business days after the system makes a written request for the records involved . . . ." 42 U.S.C. § 15043(a)(2)(J)(i). The P&A system is permitted to inspect and copy information and records, subject to a reasonable charge offsetting the duplicating costs,

---

[8]      "Records" include the following: "(1) a report prepared or received by any staff at any location at which services, supports, or other assistance is provided to individuals with developmental disabilities; (2) a report prepared by an agency or staff person charged with investigating reports of incidents of abuse or neglect, injury, or death occurring at such location, that describes such incidents and the steps taken to investigate such incidents; and (3) a discharge planning record." 42 U.S.C. § 15043(a). Furthermore, "records" include "[i]ndividual records to which P&A systems must have access under section 143(a)(2), (A)(i), (B), (I), and (J) of the DD Act (whether written or in another medium, draft, preliminary or final, including handwritten notes, electronic files, photographs or video or audiotape records." 45 C.F.R. § 1326.25(b).

and "[i]f a party other than the P&A system performs the photocopying or other reproduction of records, it shall provide the photocopies or reproductions to the P&A system within the time frame specified [above] . . . ." 45 C.F.R. § 1326.25(d). Finally, the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") "permits the disclosure of protected health information without the authorization of the individual to a P&A system to the extent such disclosure is required by law and the disclosure complies with the requirements of that law." 45 C.F.R. § 1326.25(e).[9]

Under the PAIMI Act, a P&A system has the authority to, among other things, "investigate incidents of abuse and neglect of individuals with mental illness if the incidents are reported to the system or if there is probable cause to believe the incidents occurred," "have access to facilities in the State providing care or treatment, and "have access to all records of (A) any individual who is a client of the system if such individual, or the legal guardian, conservator, or other legal representative of such individual, has authorized the system to have such access," or "(B) any individual (including an individual who has died or whose whereabouts are unknown) . . . with respect to whom a complaint has been received by the system or with respect to whom as a result of monitoring or other activities (either of which result from a complaint or other evidence) there is probable cause to believe that such individual has been subject to abuse or neglect." 42 U.S.C. § 10805(a).[10] The P&A system "shall be permitted to inspect and copy

_____

[9]     The P&A system must comply with the confidentiality provisions of all applicable federal and state laws, and must keep confidential all records and information. 45 C.F.R. § 1326.28(a), (b).

[10]     "Records" include "reports prepared by any staff of a facility rendering care and treatment or reports prepared by an agency charged with investigating reports of incidents of abuse, neglect, and injury occurring at such facility that describe incidents of abuse, neglect, or injury occurring at such facility and the steps taken to investigate such incidents, and discharge planning records." 42 U.S.C. § 10806(b)(3)(A). Furthermore, "records" include "[i]nformation

records, subject to a reasonable charge to offset duplicating costs," and access to records under the PAIMI Act "shall be extended promptly" to the P&A.  42 C.F.R. § 51.41(a), (e). Additionally, "[i]f a P&A system's access to facilities, programs, residents or records . . . delayed or denied, the P&A system shall be provided promptly with a written statement of reasons."  42 C.F.R. § 51.43.[11]

Under the PAAT Act, to "enable[e] such systems to assist in the acquisition, utilization, or maintenance or assistive technology devices or assistive services for individuals with disabilities," a P&A system has the "same general authority as the systems are afforded under subtitle C of title I of the DD Act."  29 U.S.C. § 3004(a)(1), (2).

Finally, pursuant to a New York law, effective as of December 22, 2021,

> Copies of records shall be provided to the independent agency free of charge within three business days of receipt of a written request, or if there is a complaint of health or safety placing individuals in serious and immediate jeopardy, or in the case of the death of an individual with a disability, within twenty-four hours of receipt of a written request.

2021 N.Y. Sess. Laws Ch. 755 (McKinney).[12]

## III.   ANALYSIS

After carefully considering whether Plaintiff is entitled to a preliminary injunction requiring Defendants to provide it with copies to the records requested by Plaintiff, the Court

---

[11]     and individual records, whether written or in another medium, draft or final, including handwritten notes, electronic files, photographs or video or audio tape records."  42 C.F.R. § 51.41(c).

[11]     The system must maintain the confidentiality of records that are required to be maintained in a confidential manner under any federal or state law.  42 U.S.C. § 10806(a).

[12]     The Court notes that, because Defendant's complained-of conduct occurred before the effective date of this legislation, the recently enacted New York law does not materially change the Court's analysis of whether Plaintiff is entitled to a preliminary injunction.

answers this question in the affirmative for the relevant reasons stated in Plaintiff's memoranda of law. *See*, *supra*, Parts I.C.1. and I.C.3. of this Decision and Order.  To those reasons, the Court adds the following analysis.

As an initial matter, the Court agrees with Defendants that Plaintiff's motion should be analyzed under the stricter standard of "clear or substantial" likelihood of success and "strong" showing of irreparable harm given the nature and extent of relief that Plaintiff seeks.  As discussed above in Part I.C.1. of this Decision and Order, Plaintiff seeks a preliminary injunction ordering Defendants to provide it with the relevant records requested for Incarcerated Individual A, Incarcerated Individual B, and Incarcerated Individual C.  (Dkt. No. 6.)  Were this Court to grant Plaintiff's request for a preliminary injunction and order Defendants to provide Plaintiff with the requested records, that injunction would alter the status quo that currently exists between the parties in that Plaintiff would now obtain documents in a method to which Defendants assert that Plaintiff is not entitled to pursue.  As a result, the Court will apply the stricter standard when assessing Plaintiff's entitlement to a preliminary injunction.

### A.    Clear or Substantial Likelihood of Success on the Merits

First, the Court finds that Plaintiff has shown a clear or substantial likelihood of success on the merits of at least one of its claims, specifically its claim that Defendants' actions regarding the requests for records related to Incarcerated Individual A, Incarcerated Individual B, and Incarcerated Individual C violated the DD Act and PAIMI Act.  Although the P&A Acts contain identical obligations and requirements in many respects, they do contain some differences; so it is important to clarify which act applies to which of the relevant individuals.  In the Complaint, Plaintiff alleges that Incarcerated Individual A is an individual with a physical disability, Incarcerated Individual B is an individual with a developmental disability, and

Incarcerated Individual C is an individual with a mental illness.  (Dkt. No. 1, at ¶¶ 35, 49, 60 [Pl.'s Compl.].)  As a result, Plaintiff's claim for a violation of the DD Act applies to Incarcerated Individual A and Incarcerated Individual B, while Plaintiff's claim for a violation of the PAIMI Act applies to Individual C.

Following its issuance of *DRNY I*, the Court clarified several points of its holding to mean as follows:

> As a result, on page 63 of its Decision and Order, when the Court stated, "In essentially interpreting the term 'inspect and copy' to mean 'inspect then copy,'" the Court should have stated, "'In essentially interpreting the term 'inspect and copy' to mean '***inspect and/or copy (upon presentation)***.'"  The Court notes that, under any reasonable construction of the regulatory right to copy non-electronic records oneself or have copies made by a service provider, the three-business-day clock governing the service provider's copying of the non-electronic records does not start running until the service provider has been ***presented*** with the particular records to be copied (whether [1] by the P&A directly, following its own inspection, or [2] through the service provider's retrieval of the records, following a sufficient identification of them by the P&A to enable the retrieval).

(*DRNY I*, Dkt. No. 73, at 13.)

> Based on the plain language of the regulation, the Court finds that a prerequisite of the P&A system's right to obtain copies of the information and records of an individual is the P&A system's ***sufficient identification*** of the information and records ***to enable the custodian of records to know which non-electronic records are to be copied*** (as well as the custodian's retrieval of those records).

(*Id.* at 14.)

> [A] right of the P&A system to obtain records of an individual within three business days merely by sending a written demand to the service provider (without there having been either a ***sufficient identification*** of the records ***to enable the custodian of records to know which non-electronic records are to be copied*** or the retrieval of those records) is not reasonably set forth in this regulation, based on its plain language.

(*Id.*)

### 1.    Incarcerated Individual A and Incarcerated Individual B[13]

As to Incarcerated Individual A and Incarcerated Individual B, Plaintiff argues that Defendants failed to comply with the DD Act by failing to disclose the requested records within the timeframe specified in that Act.  (Dkt. No. 6, Attach. 2, at 10-11 [Pl.'s Mem. of Law].)

As indicated above in Part I.C.2. of this Decision and Order, in their opposition to Plaintiff's motion, Defendants assert two arguments.  (Dkt. No. 17, at 5-13 [Defs.' Mem. of Law].)  First, Plaintiff failed to establish a clear or substantial likelihood of success on the merits of its claims by failing to identify the records it sought to be copied.  (*Id.* at 11.)  More specifically, they argue that Plaintiff's records requests do not identify specific documents that would enable DOCCS employees to merely retrieve the records.  (*Id.* at 11-12.)  Instead, according to Defendants, the records requests require that DOCCS employees undertake a comprehensive search of its records to identify, what, if any, documents exist and which of those documents are responsive to Plaintiff's requests.  (*Id.*)  Moreover, Defendants argue that the records being requested exceed the scope contemplated by the Court in *DRNY II* because the request requires that the DOCCS employee who is conducting the search for records be "versed in the subject matter to be able to differentiate between responsive and non-responsive documents."  (*Id.* at 11-12.)  Second, Defendants rely on *DRNY I*, in which they argue the Court held that, as a prerequisite to obtaining copies of the relevant records, Plaintiff must first physically inspect the records in question.  (*Id.* at 5-9.)  For ease of analysis, the Court will address these arguments out of order by analyzing Defendants' second argument first.

---

[13]     The Court notes that this analysis is also applicable to Plaintiff's records request pertaining to Incarcerated Individual C because the only difference between the three records requests is that the DD Act governs the requests pertaining to Incarcerated Individuals A and B, while the PAIMI Act governs the request pertaining to Incarcerated Individual C.

The Court disagrees with Defendants' argument that Plaintiff failed to establish a clear or substantial likelihood of success on the merits of its claims based on its refusal to physically inspect the records relating to Incarcerated Individual A and Incarcerated Individual B.  In making this argument, Defendants ignore the fact that DOCCS—on its own volition—denied Plaintiff access to physically inspect records.  More specifically, on January 4, 2021, Plaintiff submitted a request to obtain copies of relevant records.  (Dkt. No. 6, Attach. 8, at 1.)  On January 7, 2021, Cathy Y. Sheehan ("Ms. Sheehan"), Acting Deputy Commissioner and Counsel for DOCCS, responded to Plaintiff's request for records.  (*Id.* at 5-7.)  In that response, Defendants stated as follows:

> [A]s a result of the significant increase in COVID-19 infections, visitations to facilities are temporarily suspended statewide . . . and [t]herefore, [DOCCS] will resume the previous practice of [DRNY] obtaining copies of documents through in person review of marking the pages to be copied at the time of inspection when it is safe to do so.  Please contact [DOCCS'] Assistant General Counsel . . . in two weeks to determine if a mutually agreeable time and date for review and inspection may be scheduled.

(*Id.* at 7.)

In Plaintiff's reply to Ms. Sheehan, Plaintiff explained that it was not requesting to view the records in person because its written request identified the records being sought (and therefore the suspension of visitation would not affect Plaintiff's ability to obtain the records). (*Id.* at 8.)  Although Plaintiff did not make a direct request to physically inspect the relevant records, Defendants nonetheless denied it access to do so.  (*Id.* at 7.)

Notably absent from Defendants' opposition to Plaintiff's motion is any legal authority for their "temporary suspension" of Plaintiff's right to visit DOCCS facilities and search for the records in question itself due to the COVID-19 pandemic.[14]

Additionally, as the United States Department of Justice previously argued, "[n]either the applicable statutes, nor their implementing regulations, impose a requirement of onsite [records] inspection and to do so would frustrate the purpose and intent of the statutes." (*DRNY I*, Dkt. No. 62, at 1-2) (citing 42 U.S.C. §§ 15043[a][2][I] and [J]; 45 C.F.R § 1326.25; 42 U.S.C. § 10805[a][4]; 42 C.F.R. § 51.41). In fact, the only prerequisite that exists in the context of a P&A system obtaining records from a service provider is "the P&A system's sufficient identification of the information and records to enable the custodian of records to know which non-electronic records are to be copied (as well as the custodian's retrieval of those records)." (*DRNY I*, Dkt. No. 73, at 14.)

Defendants are incorrect in pointing out that neither *DRNY I* nor *DRNY II* contemplates written requests for records. Rather, on page 14 of its Decision and Order of November 4, 2020, in *DRNY I*, the Court indicated that the P&A system has a right to request copies of records in writing when that writing sufficiently identifies the records to enable the custodian of records to know which ones to copy. (*DRNY I*, Dkt. No. 73, at 14.) In any event, given Defendants' denial on both fronts—to allow Plaintiff to physically inspect records and to provide Plaintiff with

---

[14]     The Court notes that, with respect to Incarcerated Individual B, on January 7, 2021, Plaintiff submitted a request to obtain copies of relevant records. (Dkt. No. 6, Attach. 8, at 11-16.) On January 11, 2021, Ms. Sheehan responded to Plaintiff's request with the same language that was contained in DOCCS' response to Plaintiff's records request pertaining to Incarcerated Individual A. (*Id.* at 17.) Additionally, the Court notes that, with respect to Incarcerated Individual C, on January 11, 2021, Plaintiff submitted a request to obtain copies of relevant records. (*Id.* at 18-22.) On January 15, 2021, Ms. Sheehan responded to Plaintiff's request with the same language contained in DOCCS' response to Plaintiff's records requests pertaining to Incarcerated Individual A and Incarcerated Individual B. (*Id.* at 23-24.)

copies of those records—what other course of action was Plaintiff left with?  The Court cannot think of one, and finds that Plaintiff's only viable option (to achieve and to maintain its statutory mandate) was to seek injunctive relief.

Turning to Defendants' first argument, the Court disagrees with Defendants' argument that Plaintiff failed to establish by a clear or substantial likelihood of success on the merits of its claims because Plaintiff did not identify the records it sought to be copied.  Plaintiff's written request for records pertaining to Incarcerated Individual A made clear reference to the records being sought:

> (1)  Original grievance (log number SUL-0723-20) filed by [Incarcerated Individual A] on October 14, 2020; and
> (2)  All audiology evaluation report(s) of [Incarcerated Individual A] between January 2018 to present.

(Dkt. No. 6, Attach. 8, at 2.)

The three-business-day clock governing the service provider's copying of non-electronic records began to run at some point shortly after January 4, 2021, because on that date Plaintiff provided sufficient information to enable DOCCS to identify and locate the relevant records pertaining to Incarcerated Individual A.

Likewise, Plaintiff's written request for records pertaining to Incarcerated Individual B made clear reference to the records being sought:

> (1)  Chronological Entry Sheets from the period of August 1, 2018, through November 30, 2018
> (2)  Psychological assessment(s) from the period of August 1, 2018, through November 30, 2018
> (3)  Adaptive functioning assessment(s) from the period of August 1, 2018, through November 30, 2018
> (4)  Assessment(s) of Intellectual Functioning from the period of August 1, 2018, through November 30, 2018
> (5)  CAR Program Inmate Assessments Form(s) from the period of August 1, 2018, through November 30, 2018

(6)     CAR Program Inmate Referral Form(s) from the period of August
        1, 2018 through November 30, 2018
(7)     CAR Program Rehabilitation Plan(s) from the period of August 1,
        2018, through November 30, 2018
(8)     CAR Program Report Cards from the period of August 1, 2018,
        through November 30, 2018
(9)     Unusual Incident Reports from the period of August 1, 2018,
        through November 30, 2018
(10)    Inmate Informational Reports from the period of August 1, 2018,
        through November 30, 2018
(11)    CAR Program Discharge Recommendation Form from the period
        of August 1, 2018, through November 30, 2018

(*Id.* at 11-12.)

The Court finds that this records request sufficiently identifies the records to enable the

custodian of records to know which non-electronic records Plaintiff was seeking to be copied and

obtained.  For example, in each of its records requests, Plaintiff provides as follows: (a) the

individual who is the subject of the records; (b) the nature of the record; and (c) the specific date

(or date range) of the record.  (*Id.* at 2, 11-12, 19-20.)

The Court is unpersuaded by Defendants' argument that Plaintiff's records requests are

too burdensome.  According to Defendants, the retrieval of the documents that Plaintiff

requested would require DOCCS employees to search its records, and subsequently know how to

identify them.  (Dkt. No. 17, at 11-12 [Defs.' Opp'n Mem. of Law].)[15]  The Court respectfully

disagrees, based on the current record.  In the Court's view, at best, any deficiencies in Plaintiff's

written description of the records to be retrieved affect the time needed to retrieve them, not the

right to obtain copies of them.  Moreover, given Defendants' refusal to allow Plaintiff to

physically inspect the records, Plaintiff had no opportunity to flag the records it seeks to be

copied.  Additionally, in making this argument, Defendants ignore the fact that DOCCS created

---

[15]     Instead, Defendants argue that DOCCS' only obligation is to copy records that had been
previously flagged by Plaintiff.  (Dkt. No. 17, at 12.)

these forms, serves as a records custodian for these forms, and regularly uses these forms in its daily operations.  Therefore, Defendants' position that DOCCS employees would not have the wherewithal or training to recognize and identify the requested records is insufficient to justify DOCCS' refusal to produce copies of the records.

For all of these reasons, the Court finds that Plaintiff has shown a clear or substantial likelihood of success on the merits of its claim that Defendants failed to provide the requested records for Incarcerated Individual A and Incarcerated Individual B within the timeframe required by the DD Act for the purposes of this motion.

### 2.      Incarcerated Individual C

As to Incarcerated Individual C, Plaintiff argues that Defendants failed to comply with the PAIMI Act by failing to disclose the requested records within the timeframe specified in that Act.  (Dkt. No. 6, Attach. 2, at 10-11 [Pl.'s Mem. of Law].)

Unlike the DD Act, the PAIMI Act does not specify a timeline for providing access to records.  However, the implementing regulation requires that such access shall be provided "promptly."  42 C.F.R. § 51.41(a).  Additionally, "the parties may use the deadlines in the DD Act as a guideline for requests under the PAIMI Act, but this approach should reflect a good faith analysis of the nature and extent of the request.  A narrow request for a small number of documents should not require the full three days allowed under the DD Act, while a very broad and time intensive request should be allowed some leeway."  *Prot. & Advoc. Sys., Inc. v. Freudenthal*, 412 F. Supp.2d 1211, 1220-21 (D. Wy. 2006) (approving alternative access agreement between P&A system and hospital as consistent with P&A statutes); *cf. Michigan Prot. & Advoc. Serv., Inc. v. Flint Cmty. Sch.*, 146 F. Supp.3d 897, 908 (E.D. Mich. 2015)

(determining that school records should be provided within five days of request in order to

satisfy the PAIMI Act).

Like its records requests pertaining to Incarcerated Individual A and Incarcerated

Individual B, Plaintiff's written request for records pertaining to Incarcerated Individual C made

clear reference to the records being sought:

(1)   Unusual incident reports from December 2019 to date of production.

(2)   Inmate misbehavior reports from December 2019 to date of production.

(3)   Use of force reports from December 2019 to date of production.

(4)   Inmate injury reports from December 2019 to date of production.

(5)   All inmate disciplinary records for incidents occurring December 2019 through the date of production, including disciplinary history report, hearing packets, superintendent's review of disciplinary disposition forms, deprivation orders, time-cut documents, and appeals.

(6)   Medical records related to inmate hand injury, including evaluations, treatment records, injury reports, and color photographs of the injuries relating to a May 29, 2020 incident.

(7)   All To/From memoranda relating to the May 29, 2020 cell extraction; requests for Crisis Intervention Unit, clergy or a counselor involvement; and medical and security authorizations for use of chemical agents.

(8)   Inmate grievances, appeals, and responses from each level of review for grievances submitted from December 2019 through the date of production.

(9)   Office of Special Investigations (OSI) records, original complaints, OSI response, and reports of investigations related to complaints submitted between December 1, 2019 through the date of production.

(10)  Cell shield orders and renewals in effect December 2019 through date of production.

(11)  RCTP admission records, stamps, deprivation orders, and privilege tracker related to January 24, 2020, and May 29, 2020 admissions.

(Dkt. No. 6, Attach. 8, at 19-20.)

Plaintiff's records request pertaining to Incarcerated Individual C—which covered a

timeframe of approximately thirteen months—contained requests for eleven types of records.  As

previously stated, the PAIMI Act provides only that a P&A system shall be granted access to records "promptly."  However, district courts have used the timelines set forth in the DD Act as guidance for records requests pursuant to the PAIMI Act.  (*DRNY I*, Dkt. No. 41, at 67.)  On January 11, 2021, Plaintiff submitted its records request.  (Dkt. No. 6, Attach. 8, at 18-22.)  As of the date of this Decision and Order, Defendants have failed to produce the records identified in Plaintiff's request.  Applying this guidance to Plaintiff's records request pertaining to Incarcerated Individual C, any reasonable timeline with substantial leeway for production of records has certainly come and gone.

### B.      Strong Showing of Irreparable Harm

As an initial matter, the Court observes that multiple district courts have concluded that failure to comply with the P&A Acts in a way that prevents the P&A system from pursuing its full right to access records and fulfill its mandate constitutes irreparable harm as a general matter.  *See, e.g.*, *Disability Rights New York v. New York State Dep't of Corrs. and Cmty. Supervision*, 18-CV-0980, 2019 WL 4643814, at *21 (N.D.N.Y. Sept. 24, 2019) (Suddaby, C.J.) (finding that denial of records or untimely provision of records left plaintiff with no other adequate remedy at law and that plaintiff "would be irreparably harmed if it is 'prevented from pursuing fully its right to access records' in furtherance of its statutory duties"); *Disability Rights Florida, Inc. v. Jacobs*, 473 F. Supp.3d 1335, 1340 (M.D. Fla. Aug. 27, 2019) (finding that the defendants' refusal to provide the P&A system plaintiff with access to the facility "does, in a very real and readily identifiable way, pose a threat to [plaintiff's] being able to discharge its obligations[,] [a]nd no amount of damages will remedy that sustained harm"); *Matter of Disability Rights Idaho Request for Ada Cnty. Coroner Records Relating to the Death of D.T.*, 168 F. Supp.3d 1282, 1300 (D. Idaho 2016) (noting that "[n]umerous courts have concluded that

a P&A's inability to meet its federal statutory mandate to protect and advocate on behalf of those with mental illness constitutes irreparable harm," and finding that the failure by the defendant to turn over coroner's records to which the P&A system was entitled under PAIMI constituted immediate and irreparable harm); *State of Connecticut Off. of Prot. and Advoc. for Persons with Disabilities v. Hartford*, 355 F. Supp.2d 649, 653 (D. Conn. 2005) (nothing that "[c]ourts have concluded that a protection and advocacy system's inability to meet its federal statutory mandate to protect and advocate the rights of disabled people . . . constitutes irreparable harm," and that the only adequate relief available to the plaintiff were it to succeed on the merits of its claims was to require defendants to provide access to the relevant records); *cf. Disability Rights New York v. Wise*, 171 F. Supp.3d 54, 61-62 (N.D.N.Y. 2016) (Sharpe, J.) (noting that, "[b]y redacting and withholding portions of its reports, the Justice Center has interfered with DRNY's mandate to protect and advocate on behalf of individuals with mental illness and developmental disabilities, and particularly its mandate to investigate incidents of abuse and neglect" and that "defendants' contention that access to the entirety of information included in the reports of investigatory agencies is not essential to a P&A system's statutory mandate is contrary to the explicit language of the statutes granting P&A systems access to such reports."). Thus, where a violation of the P&A statutes interferes with Plaintiff's ability to investigate allegations of abuse or neglect or otherwise fulfill its statutory mandate, irreparable harm has occurred.

Plaintiff argues that it has and will continue to suffer an irreparable harm resulting from Defendants' continued denial of access to the requested records. (Dkt. No. 6, Attach. 2, at 11-12 [Pl.'s Mem. of Law].) Specifically, Plaintiff contends that Defendants' refusal to provide the requested records pursuant to the P&A Acts prevent it from carrying out its statutory mandate to

protect individuals with disabilities, investigate allegations of abuse and neglect, and provide legal advocacy for those individuals.  (*Id.*)

Defendants argue that Plaintiff has failed to establish that it would be irreparably harmed by its alleged failure to provide copies of records.  Specifically, Defendants contend that they offered to arrange for Plaintiff to access the facilities that housed the relevant records to allow for a physical inspection of them.  However, in response those offers, Plaintiff advised that it was seeking to receive copies of the records, not an opportunity to physically inspect them.  According to Defendant, the Court's holding in *DRNY II*—that Plaintiff was unable to establish it would suffer irreparable harm in a situation where at any point it could arrange for its own access and review the records at issue—supports its position that Plaintiff failed to establish it would suffer irreparable harm in this case.  (Dkt. No. 17, at 13-14 [Defs.' Opp'n Mem. of Law].)

The Court finds that Plaintiff has satisfied its burden to make a strong showing that it will suffer irreparable harm if it continued to be denied access to the records pertaining to Incarcerated Individuals A, B, and C.  Although Defendants' argument correctly cites the Court's holding in *DRNY II*, it fails to acknowledge that in its January 7, 2021 response to Plaintiff's request for records, DOCCS informed Plaintiff that it would have denied any request to physically inspect any records (regardless of whether Plaintiff was willing to physically inspect the records).

Defendants argue that Plaintiff cannot establish it suffered irreparable harm because DOCCS offered to arrange for Plaintiff's access to the facilities at issue for the physical inspection and review of the relevant records, to which Plaintiff subsequently did not follow-up on.  (Dkt. No. 17, at 13 [Defs.' Opp'n Mem. of Law].)  The Court finds this argument to be without merit for two reasons.

First, Acting Deputy Commissioner and Counsel Sheehan's responses to all three records requests state that DOCCS had temporarily suspended visitation to its facilities without any mention of an end-date.  Further along in her responses, Ms. Sheehan stated that Plaintiff should contact DOCCS' Assistant General Counsel in two weeks' time from the dates of her correspondence to schedule to a visit to inspect the relevant records.  The Court finds this correspondence to be unclear as to when the visit to a DOCCS facility would actually occur.  In other words, the response informs Plaintiff only of when to contact DOCCS' Assistant General Counsel, not when Plaintiff could expect to inspect the relevant records.

Second, Ms. Sheehan's identical responses to Plaintiff's three records requests—the earliest possible date that Plaintiff could physically inspect the records would be fourteen days from the respective dates of her responses—indicate that Defendants violated the DD Act. Under 42 U.S.C. § 15043(a)(2)(J)(i), P&A systems are entitled to have access to records "that are relevant to conducting an investigation . . . not later than 3 business days after the system makes a written request for the records involved."  The Court finds that Defendants' reliance on the COVID-19 pandemic does not excuse it from abiding by existing federal statutes that place mandates and responsibilities on P&A systems such as Plaintiff.  Therefore, even if Plaintiff had waited the fourteen days to pass, contacted DOCCS' Assistant General Counsel, and scheduled a time to physically inspect the relevant records, Defendants still would have been in violation the DD Act.

Finally, Defendants argue that Plaintiff has not alleged any urgency for its records requests as to Incarcerated Individuals A, B, and C.  (Dkt. No. 17, at 14 [Defs.' Opp'n Mem. of Law].)  Specifically, Defendant argues that, unlike prior claims by Plaintiff (that have alleged the urgent need for records), none of the record requests in this case involve allegations of abuse or

neglect.  (*Id.*)  Instead, according to Defendants, these requests for records merely are for the purpose of providing legal assistance to the three incarcerated individuals, and therefore do not constitute an urgent request.  In doing so, Defendants essentially argue that the P&A Acts only apply to instances of urgent records requests and allegations of abuse or neglect are the only instances that are deemed to be urgent.  The Court finds this argument to be fundamentally flawed because the Second Circuit has found the "argument that a P&A system has the authority to access a service location . . . only for the purpose of investigating a specific incident [i.e., abuse or neglect]" and instead, "provides access to service recipients for both investigatory and monitoring purposes," including "to monitor to ensure current respect for the rights and safety of service recipients."  *Connecticut Off. of Prot. and Advoc. For Persons With Disabilities v. Hartford Bd. of Educ.*, 464 F.3d 229, 240-242 (2d Cir. 2006).

### C.      Balance of the Equities

The Court finds that the balance of equities favors Plaintiff in this case.  As Plaintiff argues, Defendants' failure to provide sufficient access to records hampers its ability to fulfill its federal mandate to aid individuals with mental illness or a developmental disability and to conduct investigations into potential abuse or neglect of those individuals.  On the other hand, the only apparent hardship that Defendants face from the issuance of a preliminary injunction concerns a decreased capacity to pull records, supervise records reviewers, and/or make copies due to limitations imposed by the COVID-19 pandemic, because a general requirement to follow the law does not impose a hardship.  *See Matter of Disability Rights Idaho*, 168 F. Supp.3d at 1300 (D. Idaho 2016) (recognizing that issuing an injunction does not subject defendants "to a penalty or hardship since it requires them to do exactly what [the P&A statutes] require").

### D.      Public Interest

Similarly, the public interest weighs in favor of granting a preliminary injunction.

Indeed, the public interest is served by Plaintiff's ability to access records to carry out its federal

mandate.  *See Jacobs*, 473 F. Supp.3d at 1340 (finding that "it would undermine federal law and

disserve the public if DRF could not access Lakeside and access statutorily-granted duties under

the PAIMI Act"); *Matter of Disability Rights Idaho*, 168 F. Supp.3d at 1301 (finding that an

injunction would be in the public interest because "[i]t would undermine congressionally

mandated independent review if P&As were unable to review records such as those requested

here").

     **ACCORDINGLY**, it is

     **ORDERED** that Plaintiff's motion for a preliminary injunction (Dkt. No. 6) is

**<u>GRANTED</u>**; and it is further

     **ORDERED** that Defendants are preliminarily enjoined from denying Plaintiff access to

all of the above-described requested records for Incarcerated Individual A, Incarcerated

Individual B, and Incarcerated Individual C, in their possession in accordance with Plaintiff's

federally mandated P&A authority; and it is further

     **ORDERED** that Plaintiff need not post a bond.[16]

Dated: February 17, 2022
     Syracuse, New York

Glenn T. Suddaby
Chief U.S. District Judge

---

[16]    *See Allstate Ins. Co. v. Mirvis*, 08-CV-4405, 2017 WL 1166341, at *3 (E.D.N.Y. Mar. 28, 2017) ("[I]n light of the Court's determination that T. Mirvis and R. Zhuravsky have not demonstrated a likelihood that they will be harmed by the preliminary injunctions granted herein, and that Plaintiffs are very likely to prevail on the merits of the Bayberry Motion and the Turnover Motions . . . , Plaintiffs are not required to post a bond."); *Eastman Kodak Co. v. Collins Ink Corp.*, 821 F. Supp. 2d 582, 590 (W.D.N.Y. 2011) (declining to require plaintiffs to post a bond where the court "find[s] it very likely that [plaintiff] will prevail on the merits of its claims").